AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *Fourteen Digital Devices in the Custody of LASD in Whittier, California* | ) ) Case No. 2:23-mj-02287-DUTY ) |

FILED
CLERK, U.S. DISTRICT COURT

5/8/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: *Valencia Hurse* DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy and Attempt to Distribute Controlled Substances |
| 18 U.S.C. § 922(g) | Prohibited Person in Possession of a Firearm |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime |

The application is based on these facts:

See attached Affidavit
☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Alex Saldana*

*Applicant's signature*

Alex Saldana, ATF Task Force Officer

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.
Date: 5/8/23

*Judge's signature*

City and state: Los Angeles, CA

Hon. Charles Eick, U.S. Magistrate Judge

*Printed name and title*

AUSA: Elizabeth Douglas, x5728

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on April 26, 2023, and currently maintained in the custody of the Los Angeles Sherriff's Department in Whittier, California:

a.   A rose gold Apple iPhone ("SUBJECT DEVICE 1");

b.   A black LG smartphone with a cracked screen ("SUBJECT DEVICE 2");

c.   A black Nokia smartphone with a cracked screen ("SUBJECT DEVICE 3");

d.   A black Motorola smartphone in a black case ("SUBJECT DEVICE 4");

e.   A black HP external hard drive, model number SSDS700, serial number HBSA3243200655 ("SUBJECT DEVICE 5");

f.   A blue/green iPhone with a Jeep sticker affixed to it ("SUBJECT DEVICE 6");

g.   A Black ZTE phone ("SUBJECT DEVICE 7");

h.   A black Kyocera flip-style phone, model S2150 Kona ("SUBJECT DEVICE 8");

i.   A blue Motorola phone in a blue/gray case with a cracked screen, model XT2043-4, IMEI number 355539111065689 ("SUBJECT DEVICE 9");

j.   A black Samsung phone, IMEI number 356425113244122 ("SUBJECT DEVICE 10");

k.   A black and rose gold Amgoo cellular phone, model AM450 ("SUBJECT DEVICE 11");

l.   A black Motorola phone with a cracked screen, ("SUBJECT DEVICE 12");

m.   A black and brown Huawei cellular phone with a cracked screen ("SUBJECT DEVICE 13"); and

n.   A black Samsung Galaxy S7 Edge phone, IMEI 357090075948869, ("SUBJECT DEVICE 14").

**ATTACHMENT B**

## I. ITEMS TO BE SEIZED

1.     The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), 18 U.S.C. § 922(g) (prohibited person in possession of a firearm), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), namely:

a.     Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

b.     Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers

i

accessed through any push-to-talk functions, as well as all received or missed incoming calls;

   c. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

   d. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

   e. Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

   f. Data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

   g. Contents of any calendar or date book;

   h. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

   i. Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

  2. With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

   a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

   b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the attachment of other devices;

   d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   e. evidence of the times the device was used;

   f. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information about Internet Protocol addresses used by the device.

3.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.    In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return

the SUBJECT DEVICE and delete or destroy all forensic copies
thereof.

g.   If the search determines that a SUBJECT DEVICE
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

h.   If the search determines that the SUBJECT DEVICE
is (1) itself an item to be seized and/or (2) contains data
falling within the list of other items to be seized, the
government may retain the digital device and any forensic copies
of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT
DEVICE(S), the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

5.   The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to

law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    During the execution of this search warrant, law enforcement is permitted to (1) depress GARCIA's and HERNADNEZ's thumbs and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of GARCIA's and HERNADNEZ's faces with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Alex Saldana, being duly sworn, declare and state as follows:

**I.   PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrant against William Gregory GARCIA ("GARCIA") and German HERNANDEZ VELASCO ("HERNANDEZ") for 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Los Angeles County Sheriff's Department, in Whittier, California, as described more fully in Attachment A:

        a.    A rose gold Apple iPhone ("SUBJECT DEVICE 1");

        b.    A black LG smartphone with a cracked screen ("SUBJECT DEVICE 2");

        c.    A black Nokia smartphone with a cracked screen ("SUBJECT DEVICE 3");

        d.    A black Motorola smartphone in a black case ("SUBJECT DEVICE 4");

        e.    A black HP external hard drive, model number SSDS700, serial number HBSA3243200655 ("SUBJECT DEVICE 5");

        f.    A blue/green iPhone with a Jeep sticker affixed to it ("SUBJECT DEVICE 6");

        g.    A Black ZTE phone ("SUBJECT DEVICE 7");

        h.    A black Kyocera flip-style phone, model S2150 Kona ("SUBJECT DEVICE 8");

   i. A blue Motorola phone in a blue/gray case with a cracked screen, model XT2043-4, IMEI number 355539111065689 ("SUBJECT DEVICE 9");

   j. A black Samsung phone, IMEI number 356425113244122 ("SUBJECT DEVICE 10");

   k. A black and rose gold Amgoo cellular phone, model AM450 ("SUBJECT DEVICE 11");

   l. A black Motorola phone with a cracked screen, ("SUBJECT DEVICE 12");

   m. A black and brown Huawei cellular phone with a cracked screen ("SUBJECT DEVICE 13"); and

   n. A black Samsung Galaxy S7 Edge phone, IMEI 357090075948869, ("SUBJECT DEVICE 14").

  3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), 18 U.S.C. § 922(g) (prohibited person in possession of a firearm), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

  4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrants, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts and weights are approximate, and all dates and times are on or about those indicated.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Deputy with the Los Angeles County Sherriff's Department ("LASD"), where I have been employed for over 15 years.  Since the fall of 2019, I have also been designated as a Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  At the LASD Academy, I received basic narcotics training regarding paraphernalia, packaging, usage, sales, concealment, and transportation of various narcotics, as well as criminal street gangs and subcultures.  I have also attended classes and seminars related to narcotics, organized crime, and gangs.

6.    Upon completion of the LASD Academy, I worked at the Men's Central Jail for approximately five years.  There, I interviewed hundreds of inmates, including both active and inactive gang members and members of organized crime syndicates, regarding drug usage, addiction, street level sales, and the effects of drugs along with.  I also worked for Custody Investigative Services for three years, where I gathered intelligence relating to crimes and criminal organization groups operating in Los Angeles County and the surrounding counties.

During that time, I interviewed hundreds of inmates regarding gangs and narcotics distribution.  I worked as a patrol officer at Compton Sherriff's Station for approximately three years.  During that time, I participated in gang and drug-trafficking investigations, and arrested numerous suspects involving possession, possession for sales, and under the influence of various types of drugs and controlled substances.

7.    During my tenure as a LASD Deputy and ATF TFO, I have assisted in the execution of numerous search warrants related to drug-trafficking, criminal street gangs, organized crime, and firearm-related offenses.

8.    I have testified in state court as an expert for narcotics and drug trafficking organizations.  I have also taught classes in Mexico and Israel on the topic of current trends and identification of drug-trafficking organizations and the illicit products those organizations sell.  Within the United States, I have taught, and continue to teach, for the Federal Bureau of Investigations, the Drug Enforcement Administration, ATF, the Secret Service, local and state agencies, California Department of Corrections, California Narcotics Officers Association, California Gang Investigators Association, California Gang Task Force, and the National Criminal Enforcement Association.

9.    As an ATF TFO, I have participated in investigations related to the possession of illegal firearms by prohibited persons.  Through my training and experience, I am familiar with the ways in which prohibited persons possess and traffic illegal

firearms, including the use of vehicles to meet with accomplices and to collect, transport, and distribute illegal firearms and the use of digital devices to coordinate such activities.

### III.  **SUMMARY OF PROBABLE CAUSE**

10.  On April 26, 2023, the Los Angeles Sherriff Department ("LASD") was searching for a victim in a suspected kidnapping that had occurred the day before.  Video of the suspected kidnapping shows a man use what appears to be a black handgun to strike a woman across the face and force her into a car.  LASD Detectives later identified GARCIA as the suspected kidnapper and surveilled his residence.  There, they observed GARCIA and HERNANDEZ loading a van with numerous items, including ammunition cannisters, they had brought out from the residence.

11.  Pursuant to a state search warrant, LASD searched both the van and GARCIA's residence.  In the van, LASD found 17 firearms, hundreds of rounds of ammunition, approximately 38.01 kilograms of suspected methamphetamine, approximately 9.87 kilograms of suspected cocaine, approximately 921 grams of suspected fentanyl, and distribution quantities of various other drugs including suspected heroin, MDMA, Xanax, and marijuana. LASD also recovered SUBJECT DEVICES 2-5 from the van.

12.  In GARCIA's residence, LASD found two firearms, multiple rounds of ammunition, a suspected firearms silencer, numerous firearm magazines, approximately 944 grams of suspected methamphetamine, approximately 328 grams of suspected cocaine, approximately 148 grams of suspected fentanyl, and approximately 15.72 kilograms of marijuana, and SUBJECT DEVICES 6-14.

13.   Two of the 19 total firearms seized have been analyzed and confirmed to have been manufactured outside of the state of California.   Both GARCIA and HERNADNEZ have previously been convicted of a felony crime punishable by more than one year in prison and consequently are prohibited from possessing firearms and ammunition.

14.   While surveilling GARCIA's residence, LASD Detectives also observed GARCIA place a bag of items inside the passenger compartment of a pickup truck.   The vehicle was subsequently searched by LASD Deputies following a traffic stop.   Inside, law enforcement recovered a brick of suspected cocaine and SUBJECT DEVICE 1.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

15.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   LASD Responds to a Report of a Kidnapping

16.   Based on my conversations with LASD Detectives Duff and Balderrama, my review of law enforcement reports, and my review of video surveillance, I am aware of the following:

a.   On April 25, 2023, LASD Deputy Jacinto and Detectives Duff and Balderrama responded to a report of a kidnapping on Courts Avenue in Commerce, California.

b.   Deputy Jacinto interviewed C.O. who stated that she had been inside her house when she looked outside her window and saw a man drive up, get out of the car, grab a woman, and hit her in the head.   The man then pushed the woman inside the

car.  C.O. said she had yelled out to the man, who responded with obscenities and a vulgar gesture, and then the man drove away.

c.   C.O. provided Detectives Duff and Balderrama video surveillance of the incident she had observed.  This video does not have audio.  The video shows a woman -- later identified as Z.L. -- walking along the sidewalk.  She is talking on her phone and appears to be trying to hide from someone.  Z.L. briefly walks onto the driveway of a residence. Then a silver, four-door Kia ("Silver Kia") appears on the video surveillance and turns into the same driveway.

d.   The video surveillance shows the driver of the car -- later identified as GARCIA -- step out of the vehicle holding what appears to be a black pistol in his right hand. Z.L. begins walking toward the passenger side of the Silver Kia and reaches towards the passenger-side door, touching the door handle.  GARCIA then pistol whips Z.L. in the face and forces her into the front passenger seat of the Silver Kia.  GARCIA then drives the Silver Kia away.

e.   Deputy Jacinto also spoke to D.V. who said he had video surveillance of the incident as well, and D.V. provided this video surveillance to Detective Duff.

f.   Th video surveillance obtained from D.V. does have audio.  The video shows Z.L. walking along the sidewalk and then walking onto the driveway of a residence.  Then the Silver Kia appears on the video surveillance at fast speed and rapidly decelerates, partially turning into the driveway where Z.L is

standing.  Z.L. then can be heard repeatedly saying "I'll get in
the car" and walks toward the Silver Kia.  GARCIA gets out of
the car and hits Z.L. in the head; there is an audible sound
when he makes contact.  GARCIA then forces Z.L. into the front
passenger seat of the Silver Kia and drives the car away at fast
speed.

**B.   LASD Identifies GARCIA**

17.  Based on my conversations with Detectives Duff and
Balderrama and my review of law enforcement reports, I am aware
of the following:

a.   Because neither Z.L. nor GARCIA had yet been
identified, LASD put out a public bulletin in an attempt to
identify and locate the two individuals in the video and the
Silver Kia.

b.   On April 26, 2023, Los Angeles Police Department
Officer Vargas sent Detective Duff an anonymous tip that Officer
Vargas had received in response to the public bulletin.  The
anonymous tip stated that the suspected kidnapper may reside at
5031 Kinsie Street, Commerce, CA 90040 (the "Kinsie Residence")
and the license plate of the Silver Kia was 9BES863.

c.   Based on the information provided in the
anonymous tip, Detective Duff reviewed California Department of
Motor Vehicle ("DMV") records for license plate 9BES863.  Those
records indicated that the Silver Kia was registered to GARCIA
at the Kinsie Residence.  Further, California DMV records
indicated that GARCIA's residence was the Kinsie Residence.

d.   Using law enforcement databases, Detective Duff found two recent booking photographs for GARCIA.  Detective Duff compared those booking photographs to the video surveillance. The suspected kidnapper in the video surveillance had a similar physical appearance to the photographs of GARCIA, including two tattoos of black handprints on the front of each of GARCIA's shoulders.

**C.   Surveillance of the Kinsie Residence**

18.  Based on my conversations with Detectives Duff and Balderrama and my review of law enforcement reports, I am aware of the following:

a.   After Detective Duff identified GARCIA as the suspected kidnapper, LASD Detectives from the Major Crimes Bureau and Fugitive Taskforce went to the Kinsie Residence to conduct covert surveillance.  At that time, Z.L. had not yet been found.

b.   LASD Detective Lee saw the Silver Kia parked on the street outside the Kinsie Residence, which was comprised of a house in the front of the property and a structure in the rear (later determined to be a garage converted into living quarters).

c.   At approximately 12:00 pm, Detective Lee saw a silver Nissan Quest van, California license plate 7DLA774, (the "Nissan Van") driven by a man -- later identified as HERNADNEZ -- park alongside the street in front of the Kinsie Residence. HERNANDEZ quickly got out of the Nissan Van and went through a

black side gate on the side of the front house and towards the
rear of the Kinsie Residence.

        d.    Moments later, Detective Lee saw GARCIA and
HERNANDEZ walk from the rear of the Kinsie Residence.  GARCIA
got into the driver's seat of a gold Infiniti that was parked in
the driveway, drove it out of the driveway, and parked it along
the street.  HERNANDEZ then got into the Nissan Van and pulled
it into the driveway of the Kinsie Residence.  Both GARCIA and
HERNANDEZ then went back to the rear of the Kinsie Residence and
out of Detective Lee's view.

        e.    After a few minutes, Detective Lee saw GARCIA and
HERNANDEZ walk back towards the Nissan Van carrying large bags
and boxes.  GARCIA and HERNANDEZ loaded these items into the
Nissan Van.  The two then made multiple additional trips from
the rear of the Kinsie Residence to the Nissan Van carrying bags
of various sizes (including black plastic trash bags), boxes
(including a Cheez-It box), what appeared to be ammunition
cannisters, and dark-colored clothing or blankets.  Detective
Lee saw GARCIA and HERNANDEZ load these items into the Nissan
Van.

        f.    After loading the Nissan Van, GARCIA and
HERNANDEZ walked back towards the rear of the Kinsie Residence
and out of Detective Lee's view.

        g.    At approximately 1:45 p.m., Detective Lee saw a
charcoal Jeep Gladiator (the "Charcoal Jeep") driven by an
individual later identified as T.L.H. stop in front of the
Kinsie Residence.  GARCIA then placed a bag of items inside the

passenger compartment of the Charcoal Jeep.  T.L.H. then drove off in the Charcoal Jeep.

h.    Subsequently, LASD Deputies Magana and Moran conducted a traffic stop of the Charcoal Jeep.  They searched the Charcoal Jeep and found a brick of suspected cocaine in a bag that was similar in appearance to the bag LASD Detectives had seen GARCIA place inside the Charcoal Jeep.  LASD Detectives also found SUBJECT DEVICE 1 in the front passenger seat.

i.    At approximately 2:05 p.m., Detective Lee saw a white Audi sedan (the "White Audi") driven by an individual later identified as A.B. stop in front of the Kinsie Residence. GARCIA approached the White Audi on the passenger side.  GARCIA leaned into the inside of the car and appeared to be speaking with A.B.  A.B. then drove the White Audi a short way down the road and parked.  A.B. got out of the White Audi and walked back towards the Kinsie Residence carrying a black backpack.

### D.    Search of Nissan Van Reveals 17 Guns, Hundreds of Rounds of Ammunition, Suspected Drugs, and SUBJECT DEVICES 2-5

19.   Based on my conversation with Detectives Duff, Balderrama, and Judge, my review of law enforcement reports, and my review of the state search warrant described below, I am aware of the following:

a.    While LASD Detectives were surveilling the Kinsie Residence, LASD Detective Duff obtained a search warrant from the Honorable Margaret M. Bernal, Los Angeles Superior Court, Search Warrant No. NW23S00310, for, among other things, the Kinsie Residence and the Nissan Van.  The Honorable Bernal also

issued a state arrest warrant for GARCIA for kidnapping, in violation of California Penal Code Section 207(a).

b.   At approximately 2:05 p.m., shortly after GARCIA appeared to speak with A.B. in the White Audi, LASD Detectives saw GARCIA get into the driver's seat of the Nissan Van.  At that time, pursuant to the state arrest warrant, LASD Detectives arrested GARCIA.  LASD Detectives Judge, Villegas, and Bohnert then searched the Nissan Van pursuant to the state search warrant.

c.   In the Nissan Van, LASD Detectives found 17 firearms, some of which were found in a dark blue sleeping bag and a Cheez-It box that were similar in appearance to items Detective Lee saw GARCIA and HERNANDEZ load into the Nissan Van, and hundreds of rounds of ammunition in the Nissan Van including:

i.   A black AK-47 rifle with a folding stock;

ii.   A green AR-15 5.56 caliber semi-automatic pistol, with no serial number, with an attached scope;

iii. A green AR-15 semi-automatic rifle, with no serial number, with an attached scope;

iv.   A black AK-47 semi-automatic pistol;

v.   A loaded silver Keltec 9mm semi-automatic pistol;

vi.   A loaded black Browning Arms .22 caliber semi-automatic pistol;

vii. A loaded black Glock 27 .40 caliber semi-automatic pistol;

viii.    Two black Bersa .380 caliber semi-automatic pistols, one of which was loaded;

ix.  A black Sig Sauer 9 mm caliber semi-automatic pistol;

x.   Two chrome Smith and Wesson .40 caliber semi-automatic pistols, one of which was loaded;

xi.  A loaded black Ruger 5.7 mm semi-automatic pistol;

xii. A loaded black High Standard .45 caliber semi-automatic pistol;

xiii.    A loaded chrome Taurus .357 caliber revolver;

xiv. A loaded black Mossberg 9mm semi-automatic pistol;

xv.  A loaded black FN .45 caliber semi-automatic pistol; and

xvi. Hundreds of rounds of ammunition of various calibers, which were located in numerous places in the Nissan Van, including loaded in multiple firearms, in plastic bags, in ammunition cannisters, and loosely strewn around the interior of the van.

d.   LASD Detectives also found multiple firearm parts and accessories including a black Springfield handgun case, a black gun case containing a handgun holder, a black rifle stock attachment, and two black handgun magazines.

e.   In the Nissan Van, LASD Detectives also found approximately 38.01 kilograms of suspected methamphetamine,

approximately 9.87 kilograms of suspected cocaine, approximately 921 grams of suspected fentanyl, approximately 291 grams of suspected heroin, approximately 67 grams of suspected crack cocaine, approximately 119 grams of suspected MDMA, approximately 297 grams of suspected Xanax, and approximately 1.05 kilograms of suspected marijuana.

      f.   LASD Detectives recovered some of the drugs described above in black plastic trash bags and a Cheez-It box that were similar in appearance to items Detective Lee saw GARCIA and HERNANDEZ load into the Nissan Van.

      g.   LASD also found SUBJECT DEVICES 2, 3, 4, and 5 in the Nissan Van, along with approximately $427 in cash.

    **E.**    **Search of Kinsie Residence Reveals Additional Guns, Ammunition, Suspected Drugs, and SUBJECT DEVICES 6-14**

   20.   Based on my conversations with Detectives Duff and Balderrama and my review of law enforcement reports, I am aware of the following:

      a.   The Kinsie Residence is comprised of a front house, and a separate garage, converted to living quarters, in the rear.

      b.   Pursuant to the state search warrant, LASD Detectives Salcedo, Yzabal, and Mileski searched the Kinsie Residence.

      c.   In the converted garage, LASD Detectives found a California Department of Corrections Prisoner Identification Card in the name of GARCIA, as well as an expired California Identification Card in GARCIA's name.

14

d. LASD Detectives found two guns, multiple rounds of ammunition in the converted garage, a suspected firearm silencer, and numerous magazines, including:

i. A loaded grey and black FN FNS-40 .40 caliber semi-automatic handgun located in the nightstand next to the bed;

ii. A loaded black Ruger .380 caliber semi-automatic handgun located on the floor of the converted garage at the foot of the bed;

iii. Three magazines for a semi-automatic handgun in the same nightstand;

iv. A black plastic bag containing multiple rounds of ammunition, 12 semi-automatic handgun magazines, and 2 rifle magazines in a basket;

v. A gray bag containing multiple rounds of ammunition, as well as several semi-automatic handgun magazines and rifle magazines;

vi. Several rounds of ammunition in boxes on the top shelf of the closet; and

vii. A suspected black firearm silencer and a semi-automatic handgun magazine on top off a small table.

e. LASD Detectives also found approximately 944 grams of suspected methamphetamine, approximately 328 grams of suspected cocaine, approximately 148 grams of suspected fentanyl, and approximately 15.72 kilograms of marijuana in the converted garage of the Kinsie Residence.

f.    LASD Detectives found SUBJECT DEVICE 6 on the ground outside the rear door of the Kinsie Residence and SUBJECT DEVICES 7, 8, 9, 10, 11, 12, 13, and 14 inside the converted garage in a cloth basket on a shelf underneath the television.

**F.    Identification of Z.L. and Her Statements Regarding the Suspected Kidnapping**

21.    Based on my conversations with Detectives Duff and Balderrama and my review of law enforcement reports, I am aware of the following:

a.    At approximately 4:42 pm on April 26, 2023, Z.L. called the East Los Angeles Sheriff Station and said she was the woman in the video surveillance that GARCIA had hit.

b.    Detectives Duff and Balderrama interviewed Z.L. at the East Los Angeles Sherriff Station.

22.    Based on my review of the audio recording of that interview, I know that Z.L. confirmed that she was the woman in the video surveillance.  Z.L. said that GARCIA was her boyfriend.  Z.L. had arrived at his house on April 25, 2023, and the two had gotten into an argument.  Z.L. then ran away from GARCIA and he followed her in his car.

23.    Z.L. claimed that she did not recall GARCIA being armed with a pistol when he struck her.  She said she was able to partially block the blow and sustained only pain and swelling to the upper portion of the right side of her head from the blow.

24.    Z.L. said that GARCIA dropped her off at her daughter's school shortly after she got into the vehicle.

**G.    A.B. Admits S/He Intended to Buy Drugs from GARCIA**

25.   Based on my conversations with LASD Detectives Duff and Balderrama and my review of law enforcement reports, I am aware of the following:

a.   At approximately 9:46 pm on April 26, 2023, Detectives Duff and Balderrama interviewed A.B. at the East Los Angeles Sherriff Station.

b.   Detective Duff advised Barragan of his/her Miranda rights, and Barragan said s/he understood and agreed to waive those rights.

26.   Based on my review of the audio recording of Barragan's interview, A.B. initially claimed that s/he did not know GARCIA, had not been to his residence previously, and was at the Kinsie Residence to look for a truck to purchase.  A.B. then contradicted her/himself and said s/he had attended a party at the Kinsie Residence recently.

27.   A.B. ultimately admitted that s/he had gone to the Kinsie Residence to purchase cocaine from GARCIA but claimed s/he only purchases drugs from GARCIA for personal use.

**H.    GARCIA's Status as a Convicted Felon**

28.   On May 5, 2023, I reviewed certified conviction records for GARCIA and learned that GARCIA has previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year.  Specifically, on or about February 14, 2011, GARCIA was convicted of First-Degree Robbery, in violation of California Penal Code 211, in the Superior Court for the

State of California, County of Los Angeles, Case Number BA376922.

29. Based on my conversations with LASD Detectives Duff and Balderrama and my review of booking photographs of GARCIA, I am aware that GARCIA has two tattoos of handprints in black ink on the front of his left and right shoulders. He also has the words "East LA" and "Whittier Boulevard" tattooed on his stomach. Based on my training and experience, I believe that these tattoos indicate that GARCIA is associated with a criminal street gang.

**I.   HERNADNEZ's Status as a Convicted Felon**

30. On May 5, 2023, I reviewed certified conviction records for HERNANDEZ and learned that HERNANDEZ has previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year. Specifically, on or about October 14, 2014, HERNADNEZ was convicted of Possession of a Controlled Substance for Sale, in violation of California Health and Safety Code 11378, in the Superior Court of California, County of Los Angeles, Case No. BA430165.

**J.   Interstate Nexus**

31. On May 4, 2023, a Special Agent Ryan Cantanzano, an ATF Interstate Nexus Expert examined the black Glock 27 .40 caliber semi-automatic pistol seized from the Nissan Van and the black Ruger .380 caliber semi-automatic handgun seized from the Kinsie Residence and determined that both were manufactured outside of the State of California. Thus, in order for these

firearms to be recovered in California, they had to have moved in interstate and/or foreign commerce.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

32.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus

may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

33.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[1]

1.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

2.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[1] As used herein, the term "digital device" includes the SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

   3.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

4.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GARCIA's and HERNADNEZ's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of GARCIA's and HERNADNEZ's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    CONCLUSION

34.  For all of the reasons described above, there is probable cause to believe that GARCIA and HERNANDEZ have committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition.  There is also probable cause that the items to be seized described in Attachment B will

be found in a search of the SUBJECT DEVICES described in

Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 8th day of May
2023.

_____
HONORABLE CHARLES EICK
UNITED STATES MAGISTRATE JUDGE